895 P.2d 218

**Thomas McDOWELL, Plaintiff–Appellee and Cross–Appellant,**

v.

**Leonard NAPOLITANO and Ellen Goldberg, Defendants–Appellants and Cross–Appellees.**

**No. 20910.**

Supreme Court of New Mexico.

April 25, 1995.

Rodey, Dickason, Sloan, Akin & Robb, P.A., Edward Ricco, Jo Saxton Brayer, Bruce Hall, Butt, Thornton & Baehr, P.C., James P. Lyle, Albuquerque, for appellants and cross-appellees.

Chris Key, Albuquerque, for appellee and cross-appellant.

## OPINION

BACA, Chief Justice.

Appellants Leonard Napolitano and Ellen Goldberg appeal from a judgment in favor of Appellee Thomas McDowell. Based on a jury verdict, the district court awarded Appellee $400,000 for breach of contract against Appellants and adjudged that Appellants take nothing against Appellee on its breach of contract counterclaim. We address the following issues on appeal: (1) Whether the trial court had jurisdiction to hear the claim; (2) whether the trial court erred in refusing to grant a mistrial based on alleged misconduct by Appellee's counsel and the introduction of certain exhibits; (3) whether the trial court improperly refused Appellants' jury instructions on the mitigation of damages; and (4) whether Appellee's Section 1983 claim was properly dismissed. We review this case pursuant to SCRA 1986, 12–102(A)(1) (Repl. Pamp.1992), and affirm.

### I

The following facts are pertinent to this appeal. McDowell was hired by the University of New Mexico School of Medicine in 1982 as an assistant professor in the Department of Microbiology. He was considered for tenure during the 1987–88 academic year. Chairman Goldberg submitted a negative recommendation for tenure, citing McDowell's strained relationships with some of his graduate students and his lack of productivity in research and scholarly publications as the basis for her recommendation. An ad hoc review committee of senior faculty members unanimously concurred in her negative recommendation. In April 1988 Dean Napolitano denied tenure to McDowell. The University issued a final termination contract for the 1988–89 academic year as provided for in the Faculty Handbook.

McDowell appealed the denial of tenure to the University's Academic Freedom and Tenure Committee (the "AFTC"), following the appeals procedure in the Faculty Handbook. After a hearing the AFTC determined that McDowell had not been adequately advised of his shortcomings in the areas of research and publications in his third year of appointment as required by the Handbook. Therefore, the AFTC ruled that McDowell should be given a probationary contract for the 1989–90 academic year during which a thorough review of his fitness for tenure should be conducted.

Dean Napolitano disagreed with the validity and correctness of the AFTC's decision and notified McDowell that his employment with the School of Medicine would end with the 1988–89 academic year. In June 1989, McDowell filed a lawsuit seeking to enjoin the termination of his contract. A settlement agreement resulted in maintenance of the status quo during further administrative proceedings. McDowell remained employed on a month-to-month basis pending review by the Regents of Appellants' appeal from the AFTC decision.

In May 1990, the Regents upheld the AFTC decision and directed that a full tenure review be completed by June 30, 1990. The Regents stated that "[i]f the decision is positive, tenure shall be effective July 1, 1990. If the decision is negative, Dr. McDowell shall be given a one-year terminal contract for 1990–91."

McDowell's second tenure review resulted in a negative recommendation by the majority of faculty members in the Department of Microbiology. An ad hoc committee of senior faculty concurred and Dean Napolitano denied tenure. McDowell challenged the review process and appealed the second denial of tenure to the University President, who upheld the Dean's decision. McDowell did not again appeal to the Regents. McDowell was issued a terminal contract effective June 30, 1991.

McDowell filed suit for breach of contract and civil rights violations allegedly arising from his denial of tenure. Appellants counterclaimed for breach of contract. Prior to

trial, Appellants unsuccessfully moved for summary judgment on the ground that McDowell had failed to exhaust his administrative remedies as outlined in the Faculty Handbook. The trial court also denied Appellants' motion for a directed verdict based on failure to exhaust administrative remedies but did grant a directed verdict for Appellants on McDowell's civil rights retaliation claim. Only McDowell's contract claims were submitted to the jury.

At the end of the trial, Appellants requested that the court instruct the jury in accordance with SCRA 1986, 13–851 (Repl. Pamp.1991) regarding mitigation of damages for breach of contract of personal employment or, in the alternative, on mitigation of damages based on New Mexico case law. The trial court rejected Appellants' requested instructions and gave the jury instructions on the general mitigation of damages. *See* SCRA 13–1811. The jury returned a verdict in favor of McDowell in the amount of $400,000, which forms the basis for this appeal.

## II

■ The first issue that we address is whether the trial court had jurisdiction over the case. Appellants claim that jurisdiction is lacking because Appellee failed to exhaust his administrative remedies. New Mexico law has long recognized that a party must exhaust all administrative remedies before applying to a court for relief unless the legal or statutory remedies available are inadequate. *See First Nat'l Bank of Raton v. McBride,* 20 N.M. 381, 401, 149 P. 353, 359 (1915). Appellants argue that Appellee was required to submit a second appeal to the Board of Regents. Appellee counters that he complied with the University's appeals process. We agree with Appellee that he substantially complied with the appeals process.

■ The doctrine of exhaustion of remedies is absolute "where a claim is cognizable in the first instance by an administrative agency alone[. In such a case] judicial interference is withheld until the administrative process has run its course." *State ex rel. Norvell v. Arizona Pub. Serv. Co.,* 85 N.M. 165, 170, 510 P.2d 98, 103 (1973) (quoting

*United States v. Western Pac. R.R.,* 352 U.S. 59, 63, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956)); *see also Pan Am. Petroleum Corp. v. El Paso Natural Gas Co.,* 77 N.M. 481, 487, 424 P.2d 397, 403 (1966) (stating that "the exhaustion doctrine ... applies where an administrative agency alone has authority to pass on every question raised" but not to a question of law).

■ The court has original jurisdiction under the doctrine of primary jurisdiction, however, where there is an applicable common-law or legal remedy apart from or in addition to an administrative remedy, or where there is no applicable statutory administrative remedy. Under the principle of comity, the court may choose to defer to the administrative agency where the interests of justice are best served by permitting the agency to resolve factual issues within its peculiar expertise. Exhaustion of administrative remedies is not absolutely required under the doctrine of primary jurisdiction. *Arizona Pub. Serv. Co.,* 85 N.M. at 171, 510 P.2d at 104. *Cf. Gandy v. Wal–Mart Stores, Inc.,* 117 N.M. 441, 443–44, 872 P.2d 859, 862–63 (1994) (bringing claim under tort for retaliatory discharge does not require exhaustion of remedies under the Human Rights Act and stating that "under the doctrine of primary jurisdiction district courts have discretion to abstain from hearing a case that has been brought simultaneously before an administrative tribunal").

■ The court in its discretion may defer to an administrative agency in the interests of judicial economy, where the agency is in a better position to fully develop a record of the grievance. *Seefeldt v. Board of Trustees,* 487 F.Supp. 230, 233 (D.D.C.1979). Likewise, the court may defer to the agency where those most familiar with tenure requirements and regulations are best able to interpret the rules and make decisions to resolve the grievance. *See Krynicky v. University of Pittsburgh,* 560 F.Supp. 803, 807 (W.D.Pa.1983) (holding that court is not proper original forum for contract disputes between faculty and university); *Snitow v. Rutgers Univ.,* 103 N.J. 116, 510 A.2d 1118, 1123 (1986) (finding that professor's peers

and university's officers are best suited to review tenure grievance because these issues are uniquely within their expertise).

█ Because there is no statutory remedy available to University faculty, the exhaustion of remedies doctrine is not absolute. The question, therefore, is not whether Appellee failed to exhaust all procedural remedies, but whether he substantially discharged his own contractual obligations so as to be able to complain of a breach by his employer. There appears to be no dispute that during his first appeal Appellee properly followed the appeals process outlined in the Faculty Handbook. Appellants contend that Appellee failed to properly follow the procedures in his second appeal before turning to the court.

Because Appellee pursued the appeals process to the highest authority within the University, the trial court had a sufficient record to review his grievance. Before Appellee turned to the court, the University was able to develop a full and complete record of his grievance. The University exercised its discretion through two review procedures. The Board of Regents fashioned a remedy and made a final determination based on the results of its remedy. The reviews were conducted according to the appeals procedures set out in the Faculty Handbook and utilized the unique expertise of the University faculty and officers. Although Appellee did not take the last step following the second review of appealing again to the Board of Regents, he substantially complied with the terms of his employment contract. After unsuccessfully appealing the second denial to the President of the University, Appellee did not have to take his appeal back to the Regents because they had already made a final determination. We hold that the doctrine of exhaustion of administrative remedies did not apply to bar the litigation of Appellee's case. The trial court properly denied the motion.

### III

█ We next consider whether the trial court erred in refusing to grant a new trial based on alleged misconduct by Appellee's counsel. The Court recognizes the impropriety of counsel injecting his or her own credibility into a case by vouching for the credibility of witnesses. *See* SCRA 1986, 16–304(E) (Repl.Pamp.1991); *State v. Pennington*, 115 N.M. 372, 381, 851 P.2d 494, 503 (Ct.App.), *cert. denied*, 115 N.M. 409, 852 P.2d 682 (1993). Appellants argue that Appellee's counsel improperly influenced the jury through the frequent use of "I" and "we" during his direct examination of Appellee and during the cross-examination of Appellants and one of Appellants' witnesses.

Appellants rely on cases in which counsel have clearly engaged in outrageous or prejudicial conduct. *See, e.g., Moore v. Taylor Concrete & Supply Co.*, 553 So.2d 787, 793 (Fla.Dist.Ct.App.1989) (finding counsel improperly alluded to the fact that his client was not charged with a traffic violation in connection with an accident and injected himself into proceedings as a witness for his client); *Cottonwood Estates, Inc. v. Paradise Builders, Inc.*, 128 Ariz. 99, 624 P.2d 296, 302 (1981) (en banc) (denying counsel the right to try case in which he was material witness); *Weinberger v. City of New York*, 97 A.D.2d 819, 468 N.Y.S.2d 697, 699 (App.Div.1983) (finding as improper defense counsel's statements during trial as to what he had personally observed; his statement that the jury had a " 'sworn duty' to prevent the city from being 'ripped off' since 'we are all together in this' "; and his argument that plaintiff's expert was not to be believed because he had been paid to testify); *Weil v. Weil*, 283 A.D. 33, 125 N.Y.S.2d 368, 370 (App.Div.1953) (finding husband's trial attorney had violated canon of professional ethics by participating in investigation of adultery charges against wife and then giving lengthy testimony as to personal observations during investigation).

█ A review of the record shows that Appellee was a witness for two days, resulting in over 350 pages of transcripts. From this extensive testimony, Appellants object to a dozen or so incidents in which counsel improperly injected himself into his question with the use of "I" or "we." In addition, counsel occasionally injected himself into his cross-examination of Appellants and one witness. While it is far better that this type of conduct not occur, the trial court was best

702

able to observe and control the behavior of counsel. In fact, the trial court did caution counsel about the form of his questioning and from the record it appears counsel made an effort, although imperfect, to refrain from the use of "I" or "we." Unlike the cases cited by Appellants, at no point did counsel expressly assert personal knowledge or vouch for his own or his client's credibility. The record does not show that counsel belittled or demeaned Appellants or their witnesses. Although counsel's argument during closing, in which he asserted that he as well as the whole system of justice was being attacked, may come close to vouching for his own credibility, such a statement does not justify a new trial. As stated in *Pennington,* 115 N.M. at 381, 851 P.2d at 503, counsel have considerable latitude in closing arguments. We hold that counsel's conduct in the instant case did not rise to the level of misconduct that justifies reversal.

■ Appellants also argue that the trial court erred in admitting certain exhibits offered by Appellee. The exhibits were letters prepared by counsel during the course of Appellee's administrative appeals. Defendant argues that the letters written by Appellee's counsel unfairly influenced the jury's deliberations because they improperly emphasized Appellee's version of the facts and arguments.

■ It has long been held that the admission of evidence "is a matter within the sound discretion of the trial court ... that ... in the absence of a clear abuse of discretion, will not be disturbed on appeal." *Garrett v. Howden,* 73 N.M. 307, 311, 387 P.2d 874, 877 (1963). We will find an abuse of discretion when the court's decision is "without logic or reason, or that it is clearly unable to be defended." *Newsome v. Farer,* 103 N.M. 415, 420, 708 P.2d 327, 332 (1985); *accord Lowery v. Atterbury,* 113 N.M. 71, 74, 823 P.2d 313, 316 (1992). In this case, the record shows that the court made specific rulings as to all of the exhibits. Some were admitted for all purposes, some were used only for cross-examination or to refresh recollection, others were used in part but not sent to the jury, and some were excluded altogether. Limiting instructions were given at the time

the letters were introduced and again when the exhibits were submitted to the jury. From this, it cannot be shown that there was an abuse of discretion by the trial court or that the jury was unfairly prejudiced by the admission of any of these letters. We find no clear abuse of discretion in admitting Appellee's exhibits.

■ Appellants also claim that the trial court committed reversible error in allowing Appellee to use a file memorandum prepared by Goldberg on July 10, 1989. Goldberg's memorandum recorded impressions of her meetings with Napolitano and University Counsel Shannan Carter and concerned efforts to remove Appellee from his facilities at the department. During cross-examination, Goldberg expressly asked "[i]s there something written by me?" The memorandum was produced as a result of her question to refresh her memory. The memorandum was used a second time during the trial, again for the limited purpose of refreshing Carter's memory. Appellants argue that this memorandum was protected by the attorney-client privilege. SCRA 1986, 11–503 (Repl.Pamp. 1994) states that "[a] client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client."

We need not decide whether the attorney-client privilege applies in this instance because the writing was never exposed to those outside the attorney-client relationship, if such a relationship actually existed. The contents of the memorandum were never admitted into evidence, the jury never saw the memorandum, and the jury never learned of the controversy surrounding its use. We hold that the limited purpose for which Goldberg's memorandum was used, to refresh recollections, was proper under the circumstances of this case.

## IV

■ Appellants' final argument concerns whether the trial court erred in refusing their jury instructions concerning mitigation of damages. The court submitted a

general theory of mitigation to the jury. "The matter of whether the court should have given the instruction is a question of law to be decided by the trial court based upon the facts and the evidence." *Hansen v. Skate Ranch, Inc.,* 97 N.M. 486, 490, 641 P.2d 517, 521 (Ct.App.1982). If "instructions, considered as a whole, fairly present the issues and the law applicable thereto, they are sufficient. Denial of a requested instruction is not error where the instructions given adequately cover the issue." *Hudson v. Otero,* 80 N.M. 668, 670, 459 P.2d 830, 832 (1969).

 Appellants requested the following modification of SCRA 13–851:

> The measure of damages for plaintiff's breach of contract claim is the unpaid balance of the employment contract, less the amount plaintiff could through the exercise of reasonable diligence have earned, in the time made available as a result of the breach, from employment of the same quality as his employment under the breached contract.

The court considered this instruction to apply to wrongful discharge claims rather than breach of contract and, therefore, submitted SCRA 13–1811 instead:

> In fixing the amount of money which will reasonably and fairly compensate plaintiff, you are to consider that an injured person must exercise ordinary care to minimize or lessen his damages. Damages caused by his failure to exercise such care cannot be recovered.

In closing argument, Appellants focused on the allegations that Appellee had failed to seek other employment or to "cut [his] losses" by trying to find another university-level position. In reviewing these two instructions, the evidence, and the arguments, we hold that the general mitigation instruction was sufficient to alert and adequately instruct the jury with regard to the question of mitigation of damages.

## V

Finally, we address whether the lower court erred by dismissing Appellee's civil rights action brought pursuant to 42 U.S.C. § 1983 (1988). The claim alleged retaliatory conduct by Appellants after Appellee filed his lawsuit. Appellee argues that Appellants' retaliation violated his constitutional right of access to the courts. He argues that because his retaliation claim is based on access to courts rather than on freedom of speech, it is not necessary that he meet the "public concern" requirement set forth by *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). We disagree and affirm the dismissal of Appellee's cross-appeal.

 Under a Section 1983 claim, Appellee must first show that he engaged in protected activity. *San Filippo v. Bongiovanni,* 30 F.3d 424, 430–31 (3d Cir.1994). Next, he must show that the protected activity was a substantial factor motivating his denial of tenure. *Id.* Finally, Appellants may defeat Appellee's claim by showing that they would have denied him tenure even in the absence of the protected activity. *Id.*

The general rule to determine if an activity is protected under a Section 1983 claim for retaliation requires that the party alleging "retaliatory discharge from governmental employment ... establish that the conduct which triggered the discharge was protected under the first amendment." *San Filippo,* 30 F.3d at 434. When the conduct consists of speech, the court determines whether the speech addresses issues of "public concern," because a public employer may censure an employee for making public complaints about private matters. *Id.; see also Connick,* 461 U.S. at 142, 103 S.Ct. at 1687 (balancing the interests of citizen as employee with the interests of state as employer in promoting efficiency of services that public employees perform).

Appellee argues that a lawsuit does not implicate free speech but falls under the right to petition clause of the First Amendment. However, in *San Filippo,* the court noted that "each circuit court [that has] consider[ed] the issue has held that a public employee who alleges that he or she was disciplined in retaliation for having filed a lawsuit against his or her employer does not state a claim under Section 1983 unless the lawsuit addressed a matter of public concern." 30 F.3d at 440.

The right to petition, like the right of free speech, is stated in unqualified terms in the First Amendment. It is well accepted that the right of free speech depends on the context of the speech. *Connick*, 461 U.S. at 146–49, 103 S.Ct. at 1689–91. We do not need to decide whether there may be contexts in which the right to petition protects additional values because the case before us concerns an underlying dispute between an employee of the University and the University. "A private office dispute cannot be constitutionalized merely by filing a legal action." *Altman v. Hurst*, 734 F.2d 1240, 1244 n. 10 (7th Cir.1984) (per curiam). However well-taken Appellee's argument may be, not every lawsuit represents a matter of public concern. The cases Appellee relies on all present matters of public concern. *See, e.g., Morfin v. Albuquerque Pub. Schs.*, 906 F.2d 1434, 1439 (10th Cir.1990) (holding that defendant was not entitled to summary judgment because plaintiff's right to participate in a labor union is protected by the First Amendment); *Smith v. Maschner*, 899 F.2d 940, 947 (10th Cir.1990) (upholding right of prisoners to file lawsuits); *McKay v. Hammock*, 730 F.2d 1367, 1375 (10th Cir.1984) (finding summary judgment inappropriate when party deprived of access to courts by sheriff's officers).

We are not concerned with whether the right of access to the courts, i.e., the right to petition, is a fundamental right. The proper question is: When does retaliation by a public employer for the filing of a lawsuit reach constitutional significance such that a claim for relief under Section 1983 is stated. We find that this is a single-plaintiff lawsuit that does not seek pervasive or systemic relief, nor does it call the public's attention to Appellants' allegedly unlawful practices. Because we do not find that Appellee successfully showed that his lawsuit represented a matter of public concern, we do not discuss the other prongs of a Section 1983 claim. We hold that the dismissal of Appellee's Section 1983 claim was appropriate.

## VI

In conclusion, we hold that the trial court had jurisdiction to hear this case; that the conduct of Appellee's counsel did not rise to the level to warrant reversal and a new trial; that the trial court did not abuse its discretion in refusing Appellants' jury instructions; and that Appellee's Section 1983 claim was properly dismissed. The judgment of the trial court is affirmed.

**IT IS SO ORDERED.**

RANSOM and FRANCHINI, JJ., concur.